PD-0833-15

PD-0833-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/2/2015 7:05:48 PM
Accepted 7/7/2015 2:15:57 PM
ABEL ACOSTA
CLERK

NO. _____

## IN THE
## COURT OF CRIMINAL APPEALS
## OF TEXAS

**CHRISTINA LYONS,**
**Appellant**
**V.**
**STATE OF TEXAS,**
**Appellee**

**ON PETITION FOR DISCRETIONARY REVIEW**
**FROM THE THIRD COURT OF APPEALS**
**IN CAUSE NUMBER 03-12-00474-CR**
**AFFIRMING THE JUDGMENT**
**IN CAUSE NUMBER CR-11-0101**
**22ND DISTRICT COURT, HAYS COUNTY, TEXAS**

**APPELLANT'S PETITION FOR DISCRETIONARY REVIEW**

FILED IN
COURT OF CRIMINAL APPEALS

July 7, 2015

ABEL ACOSTA, CLERK

**MICHAEL C. GROSS**
**106 South St. Mary's Street, Suite 260**
**San Antonio, Texas 78205**
**Lawofcmg@gmail.com**
**(210) 354-1919**
**(210) 354-1920 FAX**

**Attorney for the Appellant,**
**CHRISTINA LYONS**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF JUDGE, PARTIES, AND COUNSEL

Honorable William Henry, 22nd Judicial District Court, Hays County, Texas

Ms. Christina Lyons, Appellant

Michael C. Gross, Attorney for the Appellant (Appeal Only)
106 South St. Mary's Street, Suite 260
San Antonio, Texas  78205

Ariel Payan, Attorney for the Appellant (Trial and Appeal)
1012 Rio Grande
Austin, Texas 78701

Sherri Tibbe, District Attorney
712 South Stagecoach Trail, Suite 2057
San Marcos, Texas  78666

Amy L. Lockhart, Assistant District Attorney (Trial Only)
712 South Stagecoach Trail, Suite 2057
San Marcos, Texas  78666

Cathy Compton, Assistant District Attorney (Trial Only)
712 South Stagecoach Trail, Suite 2057
San Marcos, Texas  78666

Angie D. Roberts-Huckaby, Assistant District Attorney (Appeal Only)
712 South Stagecoach Trail, Suite 2057
San Marcos, Texas  78666

# TABLE OF CONTENTS

IDENTITY OF JUDGE, PARTIES, AND COUNSEL. . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . 2

GROUNDS FOR REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**GROUND FOR REVIEW NUMBER ONE**. . . . . . . . . . . . . . . . . . . . . . 5

> **THE COURT OF APPEALS ERRED BY RULING THAT THE TRIAL JUDGE'S DENIAL OF ADDITIONAL TIME FOR A DEFENSE EXPERT TO BE ABLE TO ASSIST IN THE PREPARATION OF AND PRESENTATION OF THE DEFENSE IS SUBJECT TO AN ABUSE OF DISCRETION STANDARD.**

<u>Reason for Review of Ground One</u>

The Court of Appeals has decided an important question of state law in a way that conflicts with applicable decisions of the Court of Criminal Appeals. <u>Rey v. State</u>, 897 S.W.2d 333 (Tex. Crim. App. 1995); <u>DeFreece v. State</u>, 848 S.W.2d 150 (Tex. Crim. App.), <u>cert. denied</u>, 510 U.S. 905, 114 S.Ct. 284, 126 L.Ed.2d 234 (1993).

ARGUMENT AND AUTHORITIES IN SUPPORT
OF GROUND FOR REVIEW NUMBER ONE. . . . . . . . . . . . . . . . . . . . . . . 5

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

APPENDIX A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

## TABLE OF AUTHORITIES

Ake v. Oklahoma, 470 U.S. 68,
     105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

DeFreece v. State, 848 S.W.2d 150 (Tex. Crim. App.), cert. denied,
     510 U.S. 905, 114 S.Ct. 284, 126 L.Ed.2d 234 (1993).. . . . . . . . . . . . . 5, 7, 8

Lyons v. State, No. 03-12-00474-CR
     (Tex. App. - Austin, February 26, 2015, no pet. h.). . . . . . . . . . . . 2, 3, 5, 8, 9

Rey v. State, 897 S.W.2d 333
     (Tex. Crim. App. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 8, 12

### Statutes

Tex. R. App. P. 68. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

COMES NOW CHRISTINA LYONS, the Appellant in the above styled cause and, pursuant to Rule 68 of the Texas Rules of Appellate Procedure, files this, her Petition for Discretionary Review. In support of this petition, she would respectfully show the Court the following:

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the Appellant respectfully requests leave, pursuant to Tex. R. App. P. 68, to make oral argument to this Honorable Court. Counsel believes that oral argument is necessary for a full and complete understanding of the facts and constitutional issues presented herein. This request is made so that justice may be done.

## STATEMENT OF THE CASE

The Appellant was indicted in Cause Number CR-11-0101 with capital murder allegedly occurring on November 25, 2010. (T - 6).[1] The jury trial began on June 18, 2012 before the Honorable William Henry, presiding judge. (R - v.5 - 1, 40). On July 2, 2012, the jury found the Appellant guilty, contrary to her plea. (R - v.15 - 1, 4). On July 2, 2012, the judge, as required by law, sentenced the Appellant to imprisonment for life without the possibility of parole in the Texas Department of

---

[1]The clerk's record will be referred to as "T and page number." The court reporter's record will be referred to as "R and volume and page number."

1

Criminal Justice, Institutional Division. (T - 154). A motion for new trial was timely filed on July 11, 2012 and overruled. Id. at 157-167. Notice of appeal was timely filed on July 11, 2012. Id. at 156.

## STATEMENT OF PROCEDURAL HISTORY

The Court of Appeals for the Third District of Texas rendered its unpublished opinion and judgment by panel on February 26, 2015. Lyons v. State, No. 03-12-00474-CR (Tex. App. - Austin, February 26, 2015, no pet. h.). A motion for rehearing was timely filed on May 18, 2015, given the granting of extensions, and was denied on June 9, 2015.

## GROUND FOR REVIEW

GROUND FOR REVIEW NUMBER ONE
THE COURT OF APPEALS ERRED BY RULING THAT THE TRIAL JUDGE'S DENIAL OF ADDITIONAL TIME FOR A DEFENSE EXPERT TO BE ABLE TO ASSIST IN THE PREPARATION OF AND PRESENTATION OF THE DEFENSE IS SUBJECT TO AN ABUSE OF DISCRETION STANDARD. (T - 104-106, 110, 157-167; R - v.2 - 27).

## STATEMENT OF FACTS

Trial counsel was appointed on January 17, 2012 to represent the Appellant in this capital murder case. Lyons v. State, supra, at 8. Trial was scheduled for June 2012. Id. Counsel timely requested discovery but was not initially provided with the crucial medical records or radiological films of the complainant. (R - v.2 - 5-6). Three weeks prior to trial, counsel received these discovery items totaling approximately

2

1000 pages and obtained a neuro-radiologist expert to review these records. Id. On May 23, 2012, the defense expert informed counsel that a pathologist would be needed to explain to the jury that the injuries to the complainant could have been caused by a fall to the ceramic floor or by the Appellant's other child. Id. Counsel located a pathologist, but that expert informed counsel that the expert could not be prepared for trial in the time remaining before trial was scheduled to begin. Id. at 8. Counsel filed with the trial judge an ex parte motion for continuance which outlined the pathologist's (Dr. Willey's) concerns:

> Dr. Willey would be willing to testify in this case, but cannot do so in the time frame currently provided. Dr. Willey has made a preliminary review of the evidence in this case, and although he cannot make a final determination, and indeed is requesting more information than what Counsel currently has in his possession, Dr. Willey has informed the defense that these types of injuries could have been caused by a short fall onto a hard surface, like the ceramic floors of Defendant's home (located by the back door). In addition, the injuries could have been caused by another child who was present in the home, and has admitted to injuring the victim in this case. Dr. Willey's initial analysis is consistent with the defensive theory.

Lyons v. State, supra at 7.

The trial judge refused to provide to the defense additional time for this defense pathology expert to be able to assist in the preparation and presentation of the defense. The State called the following expert witnesses: a pediatric radiologist, a

3

department head of pediatric neurosurgery, a program director for pediatrics residency training, and a medical examiner pathologist. Lyons v. State, supra at 16-17. No defense expert testified in support of the defense theory that the injuries could have been caused by a fall on a hard surface or could have been caused by another child in the house. Id. at 5. Additionally, no defense expert pathologist assisted counsel in the cross-examination of the State's experts.

The defense expert pathologist would have been able to explain to the jury that the complainant suffered from weak bone density and fragility of the skull bones in particular. (T - 104-106, 110, 157-167). The defense expert pathologist would have been able to then explain to the jury that the complainant was susceptible to the injuries sustained by the complainant by means of a short fall or by the actions of a four-year-old person. Id. This was the key to the Appellant's defense. Id. The defense expert would have been able to assist the defense in cross-examination of the State's expert witnesses who all disagreed that a four-year-old could have caused the injuries to the complainant. Id. Previous counsel withdrew from the case after being denied the assistance of court-appointed experts.

## GROUND FOR REVIEW NUMBER ONE

**THE COURT OF APPEALS ERRED BY RULING THAT THE TRIAL JUDGE'S DENIAL OF ADDITIONAL TIME FOR A DEFENSE EXPERT TO BE ABLE TO ASSIST IN THE PREPARATION OF AND PRESENTATION OF THE DEFENSE IS SUBJECT TO AN ABUSE OF DISCRETION STANDARD.**

<u>Reason for Review of Ground One</u>

The Court of Appeals has decided an important question of state law in a way that conflicts with applicable decisions of the Court of Criminal Appeals. <u>Rey v. State</u>, 897 S.W.2d 333 (Tex. Crim. App. 1995); <u>DeFreece v. State</u>, 848 S.W.2d 150 (Tex. Crim. App.), <u>cert. denied</u>, 510 U.S. 905, 114 S.Ct. 284, 126 L.Ed.2d 234 (1993).

## ARGUMENT AND AUTHORITIES IN SUPPORT
## OF GROUND FOR REVIEW NUMBER ONE

In the case at bar, the court below held that a trial judge's denial of additional time in order for a defense expert to be able to assist in the preparation and presentation of the defense was subject to an abuse of discretion standard. <u>Lyons v. State</u>, No. 03-12-00474-CR at 6-9, 20 (Tex. App. - Austin, February 26, 2015). This Court has held, however, that a trial judge's denial to the defense of access to expert assistance to assist in the preparation and presentation of a defense was structural error and not subject to a harmless error analysis. <u>Rey v. State</u>, 897 S.W.2d 333 (Tex. Crim. App. 1995). Where a capital defendant has an interest in the accuracy of the proceedings, the State maintains an interest in the accuracy of the result of the trial,

5

and a defense expert is required to assist in the defensive theory of the case and present the jury with alternative theories, a trial judge's denial of access to such a defense expert is structural error and not subject to a harm analysis. Id.

In Rey v. State, the defendant was charged with capital murder. Id. The State alleged that the defendant caused the death of the complainant in the course of committing burglary of a house during which time the complainant received injuries to the head. Id. The defense claimed that the complainant died of a heart attack, not injuries to the head, and the defense informed the trial judge prior to trial and again during trial that an expert pathologist was needed to assist the defense in this regard. Id. The trial judge denied the defense access to such an expert. Id. This Court held that access to such an expert pathologist was a "'basic tool' essential to developing and presenting his defensive theory." Id. This Court held that the denial of access to such a "basic tool" was structural error not subject to a harm analysis. Id.

Rey v. State cited Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) for the proposition that a defendant must be provided with "the basic tools to present his defense within our adversarial system." Id. The Rey court recognized that Ake "placed the greatest emphasis on the third factor, discussing the importance of [defense expert] testimony in conveying to the factfinder an understanding of the defendant's [defensive issues] . . ." Id. The Rey court also recognized that Ake was concerned that "the risk of an inaccurate verdict was high where the defendant was

6

not assisted by a [defense expert] to 'help determine whether the [] defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's [expert] witnesses." Id. Where a scientific issue is likely to be a significant factor, "a defense may be devastated by the absence of a [defense expert's] examination and testimony; with such assistance, the defendant might have a reasonable chance of success." Id.

The Rey court stated that, "The adversarial model rests on the assumption that each party to a dispute, motivated by self-interest, will develop his position to the greatest extent possible . . . thus providing the factfinder an optimal vantage from which to gauge all relevant facts and make an informed decision on the merits." Id., citing DeFreece v. State, 848 S.W.2d 150 (Tex. Crim. App.), cert. denied, 510 U.S. 905, 114 S.Ct. 284, 126 L.Ed.2d 234 (1993). This Court further explained:

> In an adversarial system due process requires at least a reasonably level playing field at trial . . . It also means the appointment of a [defense expert] to provide technical assistance to the accused, to help evaluate the strength of his defense, to offer his own expert diagnosis at trial if it is favorable to that defense, and to identify the weaknesses in the State's case, if any, by testifying himself and/or preparing counsel to cross-examine opposing experts.

Id.

Rey v. State determined that this type of error is structural and cannot be evaluated for harm:

7

This analysis leads us to ask whether the error in the instant case was structural error or trial error. ***We conclude the error is structural***. We would first point out, as we have previously noted, that the Supreme Court in Ake reversed and remanded for a new trial without conducting a harm analysis. See DeFreece, 848 S.W.2d at 160. It is clear from a reading of Ake that the error at issue is structural in nature. The Court's analysis in Ake began with a revisiting of the "elementary principle" that every criminal defendant, indigent or otherwise, must have "a fair opportunity to present his defense." Ake, 470 U.S. at 76. The Court spoke in terms of the "basic tools of an adequate defense" and the "raw materials integral to the building of an effective defense" in concluding that in certain defined circumstances, discussed at length earlier in this opinion, a defense expert is such an element . . . We can conceive of few errors that are more structural in nature than one which eliminates a basic tool of an adequate defense and in doing so dramatically affects the accuracy of the jury's determination . . .

Id. (Emphasis added).

In the case at bar, counsel was appointed on January 17, 2012 to represent the Appellant in this capital murder case. Lyons v. State, supra, at 8. Trial was scheduled for June 2012. Id. Counsel timely requested discovery but was not initially provided with the crucial medical records or radiological films of the complainant. (R - v.2 - 5-6). Three weeks prior to trial, counsel received these discovery items totaling approximately 1000 pages and obtained a neuro-radiologist expert to review these records. Id. On May 23, 2012, the defense expert informed counsel that a pathologist would be needed to explain to the jury that the injuries to the complainant could have

8

been caused by a fall to the ceramic floor or by the Appellant's other child. Id.

Counsel located a pathologist, but that expert informed counsel that the expert could not be prepared for trial in the time remaining before trial was scheduled to begin. Id. at 8. Counsel filed with the trial judge an ex parte motion for continuance which outlined the pathologist's (Dr. Willey's) concerns:

> Dr. Willey would be willing to testify in this case, but cannot do so in the time frame currently provided. Dr. Willey has made a preliminary review of the evidence in this case, and although he cannot make a final determination, and indeed is requesting more information than what Counsel currently has in his possession, Dr. Willey has informed the defense that these types of injuries could have been caused by a short fall onto a hard surface, like the ceramic floors of Defendant's home (located by the back door). In addition, the injuries could have been caused by another child who was present in the home, and has admitted to injuring the victim in this case. Dr. Willey's initial analysis is consistent with the defensive theory.

Lyons v. State, supra at 7.

The trial judge refused to provide to the defense additional time for this defense pathology expert to be able to assist in the preparation and presentation of the defense. The State called the following expert witnesses: a pediatric radiologist, a department head of pediatric neurosurgery, a program director for pediatrics residency training, and a medical examiner pathologist. Lyons v. State, supra at 16-17. No defense expert testified in support of the defense theory that the injuries could have been caused by a fall on a hard surface or could have been caused by another

9

child in the house. Id. at 5. Additionally, no defense expert pathologist assisted counsel in the cross-examination of the State's experts.

The defense expert pathologist would have been able to explain to the jury that the complainant suffered from weak bone density and fragility of the skull bones in particular. (T - 104-106, 110, 157-167). The defense expert pathologist would have been able to then explain to the jury that the complainant was susceptible to the injuries sustained by the complainant by means of a short fall or by the actions of a four-year-old person. Id. This was the key to the Appellant's defense. Id. The defense expert would have been able to assist the defense in cross-examination of the State's expert witnesses who all disagreed that a four-year-old could have caused the injuries to the complainant. Id. Previous counsel withdrew from the case after being denied the assistance of court-appointed experts. It appears that the trial judge in the case at bar circumvented the decision whether or not to appoint the defense expert pathologist by merely denying the continuance request. This, in effect, was the denial of expert assistance. The defense expert pathologist was not appointed to assist counsel during this capital murder trial.

The Appellant was not provided with the basic tools to present her defense within our adversarial system. It was crucial in the Appellant's trial that a defense expert pathologist convey to the jury an understanding of the defense regarding the

10

bone condition of the complainant and the fact that a four-year-old could have caused the injuries sustained by the complainant. Given the lack of assistance by a defense expert pathologist, the risk of an inaccurate verdict is high since the Appellant was not assisted by a defense expert pathologist to present testimony and to assist in preparing the cross-examination of the State's four expert witnesses. The Appellant's defense was devastated by the absence of the defense expert's examination and testimony and assistance to defense counsel for the cross-examination of the State's four expert witnesses.

The adversarial model was not followed in the Appellant's case since the Appellant, without the assistance of a defense expert pathologist, was unable to develop her defense to the greatest extent possible. This resulted in the jury not receiving an optimal vantage from which to gauge all relevant facts and make an informed decision on the merits. The Appellant's right to due process was violated since the Appellant was denied at least a reasonably level playing field at trial given the State's four expert witnesses as opposed to no defense expert pathologist. Additionally, the Appellant was deprived of the technical assistance of a defense expert pathologist to help evaluate the strength of her defense, to offer his own expert diagnosis at trial favorable to that defense, and to identify the weaknesses in the State's case by testifying himself and preparing counsel to cross-examine opposing

11

experts. The Appellant's access to such an expert pathologist was a basic tool essential to developing and presenting her defensive theory just as in <u>Rey v. State</u>. This denial of access to such a basic tool was structural error not subject to a harm analysis. The court below, however, improperly applied an abuse of discretion standard.

The decision of the court below conflicts with the above-cited cases of this Court and should be reversed. Based upon the above, this Honorable Court should hold that the denial of additional time for a defense expert in pathology to be able to assist in the preparation and presentation of the defense was structural error, sustain the Appellant's points of error, and remand this cause to the trial court for a new trial.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Appellant respectfully requests that this Honorable Court grant her Petition for Discretionary Review and, after considering the Ground for Review raised herein, remand this cause back to the court of appeals with instructions to withdraw its opinion of February 26, 2015, address the issues raised herein, sustain the Appellant's Points of Error, and reverse the judgment and sentence of the trial court and remand for a new trial.

Respectfully submitted,

/s/ Michael C. Gross
Michael C. Gross
State Bar No. 08534480
106 South St. Mary's Street, Suite 260
San Antonio, Texas  78205
(210) 354-1919
(210) 354-1920 Fax

Attorney for the Appellant,
CHRISTINA LYONS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Appellant's Petition for Discretionary Review was emailed to Angie D. Roberts-Huckaby, Assistant District Attorney, angie.roberts@co.hays.tx.us, on the 2nd day of July 2015.

/s/ Michael C. Gross

## CERTIFICATE OF COMPLIANCE

1.      The brief complies with the type-volume limitation imposed by Rule 9.4(i) of the Texas Rules of Appellate Procedure because the brief contains 3,004 words excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, table of authorities, statement of the case, statement of issues presented, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix.

2.      The brief complies with the typeface and the type style requirements of Rule 9.4(e) of the Texas Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using WordPerfect 6.1 in 14 point font and Times New Roman type style.

/s/ Michael C. Gross

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00474-CR

**Christina Lyons, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR-11-0101, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Christina Lyons of the offense of capital murder.[1] The district court rendered judgment on the verdict and automatically sentenced Lyons to life imprisonment without the possibility of parole. In five points of error on appeal, Lyons asserts that the district court: (1) abused its discretion by denying her motion for continuance; (2) erred by denying her motion to quash the indictment; (3) abused its discretion by admitting hearsay evidence; (4) erred by admitting evidence in violation of the Confrontation Clause of the United States Constitution;[2] and (5) abused its discretion by excluding evidence that Lyons contends was critical to her defensive theory of the case. We will affirm the district court's judgment.

---

[1] *See* Tex. Penal Code §§ 19.02(b)(1), 19.03(a)(8).

[2] *See* U.S. Const. amend. VI.

BACKGROUND

The jury heard evidence that on November 18, 2010, ten-week-old B.S. suffered serious injuries at a day-care facility owned and operated by Lyons at her residence in Kyle. EMS was called to the scene in response to a reported "ground-level fall involving an infant." Jonathan Newcomb, one of the paramedics who responded to the dispatch, testified that when he arrived at the residence, he found Lyons "cradling a young infant" who "was in really bad shape." Newcomb recounted that the infant, later identified as B.S., had "probably a three-inch welt on the side of his head, he wasn't breathing properly, he was breathing slowly and just not responding." Newcomb testified that the injuries appeared to be significantly more serious than those that could result from a "ground-level fall," and he immediately took the infant away from Lyons and departed for Dell Children's Hospital in Austin. Before he left, however, Newcomb asked Lyons what had happened to B.S. According to Newcomb, Lyons responded by "point[ing] to a couch in the living room that was sitting on a hardwood floor." On the way to the hospital, Newcomb requested that law enforcement be dispatched to the residence.

Another emergency responder, Officer Diane Talamantes of the Kyle Police Department, testified that she had observed eight children at the residence, including Lyons's four-year-old daughter, M.L. According to Talamantes, Lyons told her that she was the only adult at the residence at the time B.S. fell. After securing the scene and sending the children to the backyard, Talamantes asked Lyons what had happened to B.S. Talamantes recounted that Lyons "said that she had gone to the bathroom; she had placed [B.S.] on the sofa; and she was gone for a short while; she returned and she found [B.S.] on the floor, face up." When Talamantes asked Lyons how B.S. had

fallen from the couch to the floor, Lyons "said she didn't know if [M.L.] or [another child] had pulled [B.S.] or pulled the blanket causing [B.S.] to fall." Talamantes further testified that Lyons also divulged that she had not immediately called 911 after discovering B.S. had fallen. Instead, Lyons explained to Talamantes, she had first called her mother, her husband, and B.S.'s mother. Lyons estimated that approximately five to ten minutes had elapsed between the time she discovered that B.S. had fallen and the time she called 911.

Soon after B.S. arrived at the hospital, doctors began performing emergency brain surgery on the infant. Several doctors who had treated B.S. or had consulted on his case testified to the seriousness of B.S.'s injuries. The doctors all testified that B.S.'s injuries were not consistent with Lyons's description to the police of what had occurred. They explained that B.S. had multiple skull fractures on both sides of his head, significant swelling and bleeding in and around his brain, torn ligaments in his spinal cord, and numerous rib fractures that had predated his head injuries. The doctors testified that it was unlikely that such injuries to the head could have been caused by a fall. Instead, according to the doctors, the injuries were more consistent with what they variously described as "blunt force trauma" to the head, "high force" and multiple impacts against hard surfaces, and "violent" forward movement of the head, resulting in rapid "acceleration and deceleration" of the brain within the skull.

While at the hospital, B.S. died from his injuries. Dr. David Dolinak, the medical examiner in the case, identified B.S.'s cause of death as "blunt force head injury" and testified that the force could have been caused by "a variety of surfaces, anything . . . that's hard and reasonably smooth." He listed possible surfaces as "anything like a countertop, a table, a wall, a door, anything

3

that's fairly hard, fairly flat, fairly smooth." Dolinak ruled the death a homicide and testified that the "violent nature" of the injuries that had resulted in B.S.'s death were not consistent with an accidental cause such as a short fall. He testified:

> [T]hey're not simple injuries, they're complex injuries. By a simple injury, I would explain that as being, like, a single fracture in a straight line, like . . . a linear fracture in the skull where a kid is hurt, but they're not gonna die from that most of the time. What we have here is complex fractures, fractures that extend out or radiate out from an area. And there are multiple fractures and there's severe associated brain injury. So it's not a simple fall, it's not a simple injury mechanism, it's much more than that, it's more forceful and when the brain was severely damaged here [sic].

Lyons's defensive theory at trial was that Lyons's four-year-old daughter, M.L., had caused the injuries to B.S. Lyons did not call any expert witness to testify in support of this theory (although, as we explain below, she had filed a motion for continuance asking for additional time to secure such a witness). However, other defense witnesses, including Lyons's husband, mother, and fifteen-year-old sister, claimed to have observed M.L. playing "rough" with a baby doll on the night following the incident, including "swinging" the doll through the air and "slamming" its head against a kitchen table, and they testified that they suspected that M.L. had engaged in similar behavior with B.S. The State's expert witnesses, when asked about this theory, testified that such an explanation was unlikely because of the severity of the injuries that B.S. had sustained. According to the State's witnesses, a four-year-old child, in all likelihood, would be physically unable to exert enough force to cause such serious injuries.

Lyons also testified in her defense. According to Lyons, on the day that B.S. was injured, she had left him alone in the living room for approximately six to seven minutes. When she

4

returned to the living room, Lyons recounted, she saw that it was empty.  Lyons testified that she then opened the back door and saw M.L. standing on the deck, holding B.S.  Lyons explained that she took B.S. from M.L., returned B.S. to the chair in the living room, and saw "a big knot on the right side of his head."  Lyons then turned to M.L. and asked her, "Where did you drop him?"  Lyons testified that M.L. eventually "pointed to the deck."  Lyons acknowledged that she did not immediately call 911 after discovering that B.S. had been injured.  She further acknowledged that she had lied to the first responders about how B.S. had been injured.  When asked why she had lied about what had happened to B.S., Lyons testified that she was "scared" of what would happen to her and her daughter if she had told the truth.  Lyons accepted responsibility for leaving B.S. alone and unsupervised and agreed that she had been negligent in doing so, but she denied causing his injuries.

The jury found Lyons guilty of capital murder as charged, and the district court rendered judgment on the verdict.  Lyons subsequently filed a motion for new trial that was overruled by operation of law.  This appeal followed.

## ANALYSIS

**Motion for continuance**

In Lyons's first point of error, she asserts that the district court abused its discretion by denying her motion for continuance.  In the motion, which was filed less than two weeks before trial was scheduled to begin, Lyons asserted that, based on information that counsel had received from her court-appointed expert, Lyons would be in need of a "second expert" to review the medical and forensic files in the case and that Lyons would be unable to secure this expert by the start of trial.  At the hearing on the motion, counsel elaborated on why he believed this second expert was

5

necessary. According to counsel, the court-appointed expert, Dr. Jill Hunter, a neuroradiologist, had informed counsel that she could not testify to certain matters related to the defensive theory of the case because they were outside her purview as a neuroradiologist and had recommended that counsel obtain a second expert to address these matters. Counsel represented to the court that he had found at least one such expert, Dr. Ed Willey, a forensic pathologist located in Florida, but that Willey had informed counsel that he could not be ready for trial on the date it was scheduled to begin. Counsel acknowledged that because Willey had not yet had time to review the medical files and form an opinion, the defense did not know if Willey could actually offer "the testimony that we vitally need."

The State opposed the continuance. At the hearing, the State argued that a continuance would inconvenience the numerous doctors and other witnesses who were scheduled to testify, and urged that defense counsel had known about the trial setting for months. In reply, while acknowledging his awareness for months of the date of the trial setting, counsel maintained that he had only recently discovered the need for a continuance, after speaking with the court-appointed expert. At the conclusion of the hearing, the district court denied the motion for continuance but indicated that it might reconsider the matter at a later date if more specific information concerning Dr. Willey's potential testimony became available.

Counsel subsequently filed an ex parte supplemental motion for continuance, providing additional information concerning the matters to which he believed Dr. Willey would testify. The motion contained the following representations:

> Dr. Willey would be willing to testify in this case, but cannot do so in the time frame currently provided. Dr. Willey has made a preliminary review of the evidence in this case, and although he cannot make a final determination, and indeed is requesting

more information than what Counsel currently has in his possession, Dr. Willey has informed the defense that these types of injuries could have been caused by a short fall onto a hard surface, like the ceramic floors of Defendant's home (located by the back door). In addition, the injuries could have been caused by another child who was present in the home, and has admitted to injuring the victim in this case. Dr. Willey's initial analysis is consistent with the defensive theory.

Counsel further represented in the supplemental motion that the court-appointed expert, Dr. Hunter, "is not familiar with bio-mechanics and forensic pathology, and is therefore not medically competent to testify as to the possibility of a short fall causing this type of injury, and therefore she is not capable of establishing and proving the defense in this case." After reviewing the motion, the district court again denied the motion for continuance, and the case proceeded to trial.

Following her conviction, Lyons filed a motion for new trial. In the motion, Lyons alleged, among other grounds, that her "motion for continuance should have been granted, and she should have been allowed time to procure experts to support her defensive theory." Attached to her motion for new trial was an affidavit by Dr. Willey, in which he summarized his analysis and opinions in the case. The motion for new trial was overruled by operation of law.

"The granting or denying of a motion for continuance is within the sound discretion of the trial court."[3] Therefore, "[w]e review a trial court's ruling on a motion for continuance for abuse of discretion."[4] A trial court abuses its discretion when it acts without reference to any guiding rules or principles or when its decision is so clearly wrong that it lies outside the zone of

---

[3] *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006) (citing *Heiselbetz v. State*, 906 S.W.2d 500, 511-12 (Tex. Crim. App. 1995)).

[4] *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007) (citing *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996)).

reasonable disagreement.[5] To establish an abuse of discretion in this context, the Court of Criminal Appeals has held that at least two showings must be made. First, "[a] defendant must preliminarily demonstrate that . . . 'the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial.'"[6] Second, there must be a showing that the denial resulted in actual harm or prejudice to the defendant.[7] "'Denial of [a pretrial motion for delay or continuance] will be found an abuse of discretion on appeal only if the record shows with considerable specificity how the defendant was harmed by the absence of more preparation time than he actually had.'"[8] "'This showing can ordinarily be made only at a hearing on a motion for new trial, because almost always only at that time will the defendant be able to produce evidence as to what additional information, evidence or witnesses the defense would have had available if the motion for delay had been granted.'"[9]

---

[5] *See id*. at 777; *Gonzalez v. State*, 117 S.W.3d 831, 839 (Tex. Crim. App. 2003); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g); *Seghelmeble v. State*, 390 S.W.3d 576, 581 (Tex. App.—Dallas 2012, no pet.).

[6] *Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010) (quoting 42 George E. Dix & Robert O. Dawson, Texas Practice Series: Criminal Practice and Procedure § 28.56 (2d ed. 2001)).

[7] *See id*.

[8] *Id*. (quoting 42 Dix & Dawson, Texas Practice Series: Criminal Practice and Procedure § 28.56).

[9] *Id*. (quoting 42 Dix & Dawson, Texas Practice Series: Criminal Practice and Procedure § 28.56).

The motion for continuance in this case was also governed by article 29.06 of the Code of Criminal Procedure, which provides that when a continuance is sought to secure an absent witness, "it shall be necessary to state," among other requirements, "[t]he diligence which has been used to procure [the witness's] attendance."[10] The diligence requirement applies even when the missing witness is expected to provide expert assistance at trial.[11] The Court of Criminal Appeals has "interpreted the diligence requirement to mean not only diligence in procuring the presence of the witness, but also diligence as reflected in the timeliness with which the motion for continuance was presented."[12] When a defendant has failed to demonstrate the necessary diligence, a trial court does not abuse its discretion in denying a motion for continuance on that ground alone.[13]

Here, the district court would not have abused its discretion in finding that Lyons failed to demonstrate diligence in either procuring the presence of the witness or in presenting the motion to the district court. The record reflects that counsel was appointed to represent Lyons on January 17, 2012, after Lyons's prior counsel withdrew, and was informed in March of the trial setting. Counsel filed his first motion for continuance on June 6, 2012, less than two weeks before trial was scheduled to begin. In that motion, counsel made no representation regarding diligence as required by article 29.06. At the hearing on the motion, held on the same day that the motion was

---

[10] Tex. Code Crim. Proc. art. 29.06(2), (3); *see Harrison v. State*, 187 S.W.3d 429, 434 (Tex. Crim. App. 2005).

[11] *See Wright v. State*, 28 S.W.3d 526, 532-33 (Tex. Crim. App. 2000).

[12] *Dewberry v. State*, 4 S.W.3d 735, 756 (Tex. Crim. App. 1999).

[13] *See Gonzales*, 304 S.W.3d at 843; *Wright*, 28 S.W.3d at 532-33; *Dewberry*, 4 S.W.3d at 756.

9

filed, counsel represented that he had already received discovery from both prior counsel and the State, with the most recent discovery, the victim's medical files, having been received by counsel between three to four weeks earlier. On May 23, counsel spoke with the court-appointed expert, who at that time recommended that counsel obtain a second expert. Thus, counsel did not file his motion for continuance until two weeks after he had received the information indicating that an additional expert might be required. Also, counsel further represented that he had not spoken with Dr. Willey and two other possible experts until Sunday, June 3, which was eleven days after being notified by the expert that additional assistance might be required. Counsel attempted to justify this delay by explaining that he was counsel on other capital cases at the time, and was thus unable to contact the witnesses earlier.

When counsel later filed his supplemental motion for continuance, less than one week before trial was scheduled to begin, he stated for the first time that he had been "diligent in attempting to secure [Dr. Willey's] attendance but due to the doctor's schedule, the time frame of Counsel's notice of the need for this witness and all the other factors listed herein has been unable to do so." These other factors included counsel's previously mentioned caseload and the fact that co-counsel, who had been appointed to assist the defense on May 1, had been "out of town for 10 days since the appointment on prior commitments." Counsel added that Dr. Willey would not be available to testify until September, approximately two months after trial was set to begin. In the motion, counsel did not explain why the doctor's schedule made him unavailable for that length of time; what attempts, if any, counsel had made to secure an alternative witness who could be available for trial on schedule; or what "prior commitments" had prevented co-counsel from taking any action

10

either to file the motion for continuance earlier than June 6 or to secure a witness himself. On this record, it would not be outside the zone of reasonable disagreement for the district court to find that counsel did not exercise diligence in attempting to secure a witness and to deny the motion for continuance on that ground.[14] Accordingly, we cannot conclude that the district court abused its discretion in denying Lyons's motion for continuance.

We overrule Lyons's first point of error.

**Motion to quash**

In Lyons's second point of error, she asserts that the district court erred in denying her pretrial motion to quash the indictment. In her motion to quash, Lyons argued that the indictment failed to properly allege the manner and means of [B.S.]'s death.[15] In relevant part, the indictment alleged that Lyons "intentionally and knowingly cause[d] the death of an individual, [B.S.], by causing blunt force trauma to the head of [B.S.]" According to Lyons, the manner of death—"blunt force trauma to the head"—was properly alleged, but, in her view, the indictment needed to further allege the means, or weapon, by which Lyons had inflicted the blunt force trauma. Without

---

[14] *See Gonzales*, 304 S.W.3d at 843; *Wright*, 28 S.W.3d at 532-33; *Dewberry*, 4 S.W.3d at 756; *see also Garay v. State*, No. 08-01-00336-CR, 2003 Tex. App. LEXIS 7407, at *10-12 (Tex. App.—El Paso Aug. 28, 2003, pet. ref'd) (mem. op.) (no abuse of discretion in denying motion for continuance to obtain expert witness when defendant failed to exercise reasonable diligence to obtain expert).

[15] The manner and means of death are separate elements of the offense of murder. The Court of Criminal Appeals has described the manner of death as "the actus reus" of the offense, while describing the means as "the instrument of death." *See Sanchez v. State*, 376 S.W.3d 767, 773 (Tex. Crim. App. 2012).

11

such an allegation, Lyons claims, the indictment failed to provide her with sufficient notice of the charged offense.

The sufficiency of an indictment is a question of law that we review de novo.[16] "The Texas and United States Constitutions grant a criminal defendant the right to fair notice of the specific charged offense."[17] "To satisfy this notice requirement, an indictment must be 'specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense.'"[18] "A motion to quash should be granted only where the language concerning the defendant's conduct is so vague or indefinite as to deny the defendant effective notice of the acts she allegedly committed."[19] In most cases, "a charging instrument that tracks the statutory text of an offense is sufficient to provide a defendant with adequate notice."[20] However, "when the statutory language fails to be completely descriptive" of the offense, an indictment "that tracks the statutory

---

[16] *See Smith v. State*, 309 S.W.3d 10, 13-14 (Tex. Crim. App. 2010); *State v. Barbernell*, 257 S.W.3d 248, 251-52 (Tex. Crim. App. 2008); *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004).

[17] *Barbernell*, 257 S.W.3d at 250 (citing *Lawrence v. State*, 240 S.W.3d 912, 916 (Tex. Crim. App. 2007)); *see* U.S. Const. amend. VI; Tex. Const. art. I, § 10.

[18] *Lawrence*, 240 S.W.3d at 916.

[19] *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex. Crim. App. 1988); *Herrera v. State*, 367 S.W.3d 762, 774 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Yanes v. State*, 149 S.W.3d 708, 709 (Tex. App.—Austin 2004, pet. ref'd).

[20] *Barbernell*, 257 S.W.3d at 251.

12

language may be insufficient to provide a defendant with adequate notice."[21] "In such cases, 'more particularity is required to provide notice.'"[22]

A person commits the offense of murder if she intentionally or knowingly causes the death of an individual.[23] The indictment here tracks the statutory language by alleging that Lyons intentionally and knowingly caused the death of B.S., and it also provides more particularity than what is provided in the statute by further alleging that B.S.'s death was caused by "blunt force trauma to the head" of B.S. Nevertheless, Lyons maintains that the indictment needed to go one step further and also allege the means used to inflict blunt force trauma to B.S.'s head.[24] Assuming

---

[21] *Id.*

[22] *Id.*

[23] Tex. Penal Code § 19.02(b)(1).

[24] As support for this contention, Lyons relies on a line of older cases holding that an indictment for murder must allege the means used to cause death. *See, e.g.*, *Garrett v. State*, 682 S.W.2d 301, 308 (Tex. Crim. App. 1984) ("It is well settled that an indictment for murder should set forth the means, instrument, or weapon used; or if not known, that fact must be stated."); *Ridgely v. State*, 756 S.W.2d 870, 871 (Tex. App.—Fort Worth 1988, pet. ref'd) (reversing murder conviction when indictment failed to allege means by which victim was strangled); *see also Gragg v. State*, 186 S.W.2d 243, 243 (Tex. Crim. App. 1945) (reversing murder conviction when indictment failed to allege means by which victim was drowned); *Jackson v. State*, 28 S.W. 815 (Tex. Crim. App. 1894) (reversing murder conviction when indictment failed to allege means by which victim was shot).

Although these cases have not been overruled, we note that the continued viability of the rule upon which the cases rely has been questioned in light of modern, more relaxed pleading practices. *See* 42 George E. Dix & John M. Schmolesky, Texas Practice Series: Criminal Practice and Procedure § 25.101 (3d ed. 2011) ("The traditional requirement that the manner and means of death be specified to charge a homicide offense, whatever its original rationale, can no longer be justified as a matter of Texas pleading law. Should the issue be squarely presented to it, the Court of Criminal Appeals most likely would hold that homicide offenses, like other statutory crimes, can be charged in the language of the Penal Code.").

13

without deciding that the indictment was insufficient in that regard, we cannot conclude on this record that Lyons was harmed by any error in denying the motion to quash.[25]

If an indictment fails to allege facts sufficient to give the defendant notice of the precise offense with which she is charged, "a conviction may be affirmed as long as the defect did not prejudice the defendant's substantial rights."[26] In this context, "[t]he important question is whether a defendant had notice adequate to prepare [her] defense."[27] "[I]n order to prove reversible error, an appellant must show that the omission of the requested information had a deleterious impact on [her] ability to prepare a defense."[28]

No such showing was made here. Lyons's defense was that her daughter had caused B.S.'s injuries, and she claims that without knowing the specific means used to commit the offense, she could not fully develop that theory at trial. However, the record reflects that in this case, the defendant was in the same position as the State—the specific means used to commit the offense were unknown to both parties. At the hearing on the motion to quash, the State represented, and Lyons did not dispute, that it could allege only that the blunt force trauma was caused by "an

---

[25] *See Chambers v. State*, 866 S.W.2d 9, 17 (Tex. Crim. App. 1993) (assuming without deciding that "failure to specify the manner and means of strangulation was error" and proceeding immediately to harm analysis).

[26] *Sanchez v. State*, 120 S.W.3d 359, 367 (Tex. Crim. App. 2003) (citing Tex. Code Crim. Proc. art. 21.19; *Adams v. State*, 707 S.W.2d 900, 901-04 (Tex. Crim. App. 1986)); *see also* Tex. R. App. P. 44.2(b); *Mercier v. State*, 322 S.W.3d 258, 264 (Tex. Crim. App. 2010).

[27] *Adams*, 707 S.W.2d at 903; *Yandell v. State*, 46 S.W.3d 357, 362 (Tex. App.—Austin 2001, pet. ref'd).

[28] *Chambers*, 866 S.W.2d at 17; *Peck v. State*, 923 S.W.2d 839, 841 (Tex. App.—Tyler 1996, no pet.).

14

object unknown to the grand jury."[29] There is nothing in the record to suggest that the failure of the indictment to allege that B.S.'s death was caused by "an object unknown to the grand jury" had a deleterious impact on Lyons's ability to prepare a defense. On the contrary, the record reflects that Lyons was aware that the object used to cause death was unknown, and she used that fact to her advantage during trial to cast doubt on the State's theory of the case and to suggest, through the testimony of her own witnesses and her cross-examination of the State's witnesses, that it was possible that Lyons's daughter had caused the injuries to B.S.[30] We also observe that, although the indictment did not allege the means of death, it did allege a fairly specific manner of death—"blunt force trauma to the head" of B.S.—which provided Lyons with at least some specific notice concerning the cause of death so as to enable her to prepare her defense. Moreover, the record reflects that at the time of the hearing on the motion to quash, the State had already provided Lyons with ample discovery in the case, including the victim's medical records from the hospital. Thus, Lyons had access to the State's evidence concerning the cause of death several weeks prior to trial, which suggests that her ability to prepare a defense was not prejudiced by any failure of the

---

[29] On appeal, Lyons asserts that the State could have alleged a means that was consistent with Dr. Dolinak's trial testimony that the blunt force trauma was caused by "anything like a countertop, a table, a wall, a door, anything that's fairly hard, fairly flat, fairly smooth." However, Dolinak was merely listing possible means of committing the offense; he did not testify to what actually caused the blunt force trauma. Nor did any other witness for the State. Thus, the record reflects that the means of death were, as the State claimed, unknown.

[30] *See Flores v. State*, 33 S.W.3d 907, 919-20 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (no prejudice when there was nothing in record to suggest that "defense strategy turned" on information missing from indictment).

15

indictment to specify the means of death.[31] On this record, we cannot conclude that the denial of the motion to quash, even if erroneous, had a deleterious impact on Lyons's ability to prepare her defense.[32]

We overrule Lyons's second point of error.[33]

**Hearsay**

In her third point of error, Lyons asserts that the district court abused its discretion by admitting hearsay evidence.[34] The testimony at issue was elicited from Officer Diane Talamantes, the police officer first dispatched to the residence, and Detective Pedro Carrasco, the lead investigator in the case who had interviewed B.S.'s doctors at the hospital. Both officers were asked questions by the State concerning information that they had received and acted upon during the course of their investigation. Lyons repeatedly objected to the questions on the basis of hearsay, arguing that the questions called for testimony that went beyond any information upon which the officers acted. The district court overruled the objections but provided a limiting instruction,

---

[31] *See Dodson v. State*, 800 S.W.2d 592, 595 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd) (no prejudice when defense counsel was provided with discovery prior to trial); *DeVaughn v. State*, 759 S.W.2d 510, 512 (Tex. App.—San Antonio 1988, no pet.) (op. on remand) (same).

[32] *See Adams*, 707 S.W.2d at 904; *Flores v. State*, 102 S.W.3d 328, 332-33 (Tex. App.—Eastland 2003, pet. ref'd).

[33] Lyons also asserts under this point that, "without some limiting factor as to how the blunt force trauma was caused, it allows the State to re-indict [her] for the same offense at a later date." That complaint is not properly before us. *See Burks v. State*, 876 S.W.2d 877, 889 (Tex. Crim. App. 1994) ("In regards to any potential claim of jeopardy which appellant might have to assert in a future prosecution, the proper time to argue this issue is after [she] has been charged or indicted for that unnamed future offense. As of now, that issue is far from ripe.").

[34] *See* Tex. R. Evid. 801.

16

informing the jury that the testimony was not being offered for the truth of the matter asserted and could be considered, if it was considered at all, only for the purpose of establishing the information upon which the officers acted during the course of their investigation.[35]

We review a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion.[36] A trial court abuses its discretion in the admission or exclusion of evidence only if its decision "lies outside the zone of reasonable disagreement."[37]

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted.[38] Hearsay is inadmissible except as provided by statute or the rules of evidence.[39] A statement not offered to prove the truth of the matter asserted is not hearsay.[40] "[T]estimony by an officer that he went to a certain place or performed a certain act in response to generalized 'information received' is normally not considered hearsay because the witness should be allowed to give some explanation of his behavior."[41] "But details of the information received are considered hearsay and are inadmissible."[42] In determining whether such

---

[35] *See* Tex. R. Evid. 105(a).

[36] *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).

[37] *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Montgomery v. State*, 810 S.W.2d at 391.

[38] Tex. R. Evid. 801(d).

[39] Tex. R. Evid. 802.

[40] *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); *Sandoval v. State*, 409 S.W.3d 259, 281 (Tex. App.—Austin 2013, no pet.).

[41] *Poindexter v. State*, 153 S.W.3d 402, 408 n.21 (Tex. Crim. App. 2005).

[42] *Id*.

17

testimony is permissible, "[t]he appropriate inquiry focuses on whether the 'information received' testimony is a general description of possible criminality or a specific description of the defendant's purported involvement or link to that activity."[43] The former is admissible, the latter is not.[44] An officer "should not be permitted to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that she was entitled to tell the jury the information upon which she acted."[45]

We first consider the statements elicited from Officer Talamantes. On appeal, Lyons complains of the following testimony:

> Q. Let's back up. You said that when you first arrived, who did you immediately speak to?[46]
>
> A. I spoke with the first responder who advised there was a ten-month-old baby en route to Dell Children's Hospital.
>
> Q. Now, you said ten months, is that what he advised you?
>
> A. Yes.
>
> Q. Is that what it says in your report?
>
> A. I'm sorry. Ten weeks.

---

[43] *Id.*

[44] *See id.*

[45] *Schaffer v. State*, 777 S.W.2d 111, 114-15 (Tex. Crim. App. 1989); *Sandoval*, 409 S.W.3d at 282.

[46] Prior to asking this question, the State had asked three similar questions to which Lyons objected on the basis of hearsay. However, the State either withdrew the questions or the district court sustained the objections before the answer was elicited from the witness.

Q.  Okay.

A.  Ten-week infant en route to Dell Children's Hospital with swelling to the left side of the head and he was unresponsive and having trouble breathing.

It would not be outside the zone of reasonable disagreement for the district court to find that this testimony was permissible "information received."  The district court would not have abused its discretion in finding that the officer was simply explaining the reason why she was dispatched to the residence—to investigate a serious injury to a child—and that this explanation was not a specific description of Lyons's purported involvement in that injury.

We next consider the complained-of testimony from Detective Carrasco:

Q.  And then, did you also find out any other information when you were [at the hospital] on the evening of the 18th that led you in any certain direction in your investigation?

A.  Yes, I did.

Q.  And what was that?

A.  Upon initially arriving at Dell Children's Hospital, I was informed by one of the social workers that [B.S.] was immediately placed into brain surgery.  I was advised that he had multiple skull fractures, subdural bleeding, brain hemorrhaging, along with multiple rib fractures.  And I later confirmed this information by speaking directly to Dr. Meyers.

Q.  Okay.  And Dr. Meyers, was he one of the doctors that worked on [B.S.] at the hospital?

A.  Yes, he was the emergency room trauma doctor.

. . . .

Q.  Okay.  So the specific injuries that you were told about and that you—the information that you got that night, you went through it pretty quickly and I

19

just want to make sure that we're clear on what you understood. What did you understand with regard to the injuries that [B.S.] had to his head?

A.      There [were] multiple fractures to the skull as well as brain hemorrhaging, which was explained to me that there was also a lot of brain pressure, as well.

. . . .

Q.      And what did you come—what conclusion did you come to, as an investigator, with the information that you had received?

A.      According to the information that I gathered and the information that I had, it was my opinion that those—the trauma that he suffered was not from a two-foot fall off of the couch, considering there were multiple, multiple injuries.

. . . .

Q.      And what—what, if any, information did you receive about what was going on or what was being done to him in surgery that was significant to you or not for your investigation?

A.      One of the things that was told to me was that a piece of his skull had to be removed to relieve the pressure from his brain.

This testimony, although considerably more detailed than the testimony from Talamantes, is nevertheless limited to explaining the nature of B.S.'s injuries. The district court would not have abused its discretion in finding that this testimony was offered to explain how the police investigation, which began as a report of an accidental injury, became an investigation into possible criminal activity based on the information that Carrasco had received from the doctors at the hospital.[47]

---

[47] *See Dinkins*, 894 S.W.2d at 347 (no abuse of discretion in admitting evidence that tended to show how appellant became suspect in investigation); *Lacaze v. State*, 346 S.W.3d 113, 121 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (no abuse of discretion when officer "took the

20

Moreover, even if Talamantes's or Carrasco's testimony went beyond any permissible non-hearsay purpose, we could not conclude on this record that Lyons was harmed by its admission. The erroneous admission of evidence is nonconstitutional error.[48] We may not reverse a conviction for nonconstitutional error unless the error affected the defendant's substantial rights.[49] The erroneous admission of evidence does not affect substantial rights if, after examining the record as a whole, the reviewing court is reasonably assured that the error did not influence the verdict or had but a slight effect.[50] Here, numerous doctors testified during trial to the nature and seriousness of B.S.'s injuries, and their testimony was much more detailed and extensive than the limited testimony of Talamantes and Carrasco on that issue.[51] Moreover, the district court provided a limiting instruction prohibiting the jury from considering the evidence for impermissible purposes, and we generally presume that juries follow such instructions.[52] On this record, we are reasonably

---

jury step-by-step through the investigation to explain how all of the pieces of evidence fit together" and "helped explain why the investigation turned away" from initial focus of investigation to another theory).

[48] *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

[49] *See* Tex. R. App. P. 44.2(b).

[50] *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010).

[51] *See Anderson v. State*, 717 S.W.2d 622, 627 (Tex. Crim. App. 1986) ("If the fact to which the hearsay relates is sufficiently proved by other competent and unobjected-to evidence, as in the instant case, the admission of the hearsay is properly deemed harmless and does not constitute reversible error."); *Land v. State*, 291 S.W.3d 23, 28 (Tex. App.—Texarkana 2009, pet. ref'd) ("The admission of inadmissible evidence becomes harmless error if other evidence proving the same fact is properly admitted elsewhere (or comes in elsewhere without objection).").

[52] *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009); *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998); *Waldo v. State*, 746 S.W.2d 750, 753 (Tex. Crim. App. 1988).

assured that any error in admitting the complained-of testimony did not influence the jury or had but a slight effect.

We overrule Lyons's third point of error.

**Confrontation Clause**

In addition to objecting to the admission of Detective Carrasco's interview with Dr. Meyers on the basis of hearsay, Lyons further objected on the ground that its admission violated her right to confront the witnesses against her because Dr. Meyers did not testify at trial.[53] The district court overruled this objection, concluding that the statements made by Dr. Meyers to Detective Carrasco were non-testimonial in nature and thus did not implicate the Confrontation Clause. In her fourth point of error, Lyons asserts that the district court erred in so concluding.

"The Confrontation Clause of the Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against [her.]'"[54] "In accordance with this constitutional right, out-of-court statements offered against the accused that are 'testimonial' in nature are objectionable unless the prosecution can show that the out-of-court declarant is presently unavailable to testify in court and the accused had a prior opportunity to cross-examine him."[55] Testimonial statements include those "that were made under

---

[53] *See* U.S. Const. amend. VI.

[54] *Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010) (quoting U.S. Const. amend. VI).

[55] *Id*. at 575-76 (citing *Crawford v. Washington*, 541 U.S. 36, 59, 68 (2004); *Wall v. State*, 184 S.W.3d 730, 734-35 (Tex. Crim. App. 2006)).

circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[56] With regard to statements made in response to police inquiries, a statement is testimonial "if the circumstances, viewed objectively, show that it was not made 'to enable police assistance to meet an ongoing emergency' and 'the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'"[57] Whether a particular out-of-court statement is testimonial is a question of law that we review de novo.[58]

In *Crawford*, the Supreme Court noted that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."[59] The State, in reliance on this exception to the general rule that testimonial statements are inadmissible, argued both below and on appeal that Dr. Meyers's statements to Carrasco did not violate the Confrontation Clause because they were offered only to provide a "background explanation as to why law enforcement furthered the investigation." However, the Court of Criminal Appeals has instructed lower courts to use caution in justifying the admission of testimonial statements on the ground that they were offered only to provide the jury with "background information." The court has explained:

---

[56] *Crawford*, 541 U.S. at 52.

[57] *Langham*, 305 S.W.3d at 576 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

[58] *Id.*; *De la Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008); *Wall*, 184 S.W.3d at 742.

[59] 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

23

Typically, so-called 'background' evidence is admissible, not because it has particularly compelling probative value with respect to the elements of the alleged offense, but simply because it provides the jury with perspective, so that the jury is equipped to evaluate, in proper context, other evidence that more directly relates to elemental facts. But it is not necessary to go into elaborate detail in setting the evidentiary scene, and there is a danger inherent in doing so. Because the relevance of 'background' evidence is marginal to begin with, the introduction of too much incriminating detail may, whenever the evidence has some objectionable quality not related to its marginal relevance, prove far more prejudicial than probative. . . . And the greater and more damning the detail contained in that out-of-court statement, the greater the likelihood that the jury will gravitate toward the improper use. . . . [T]oo much damning information will erode judicial confidence that the accused has truly enjoyed his Sixth Amendment right to confront all of "the witnesses against him[.]"[60]

Assuming without deciding that the admission of Dr. Meyers's out-of-court statements to Detective Carrasco violated the Confrontation Clause, we conclude that any error in their admission was harmless. Because the alleged error implicates the Confrontation Clause, in order to find the error harmless, we "must be convinced, beyond a reasonable doubt, that the admission of the evidence would probably not have had a significant impact on the mind of an average juror."[61] "Put another way, is there a reasonable possibility that the *Crawford* error, within the context of the entire trial, 'moved the jury from a state of non-persuasion to one of persuasion' on a particular issue?"[62] On this record, we conclude that there is not. Even though Dr. Meyers did not testify at trial, numerous other doctors did, and they provided detailed and extensive testimony concerning the nature and seriousness of B.S.'s injuries. These doctors and their testimony included the following:

---

[60] *Langham*, 305 S.W.3d at 580 (quoting U.S. Const. amend. VI).

[61] *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006).

[62] *Id*. at 852-53.

24

- Dr. Gael Lonergan, a pediatric radiologist at Dell Children's Hospital, reviewed the radiological images that had been taken of B.S. Lonergan testified that a CT scan of B.S.'s head revealed a "big and wide" skull fracture with swollen brain tissue protruding out from it, along with "many areas of blood both near the fracture site and actually quite far away from it on the other complete side of the brain." Additionally, according to Lonergan, an MRI revealed that there were torn ligaments in B.S.'s cervical spinal cord, which indicated that his head went "very violently forward." Lonergan added that B.S. "had fractures on both sides of the skull." Lonergan further testified that B.S. had "a total of 14 rib fractures," some of which were in the process of healing at the time the image was taken, which indicated to her that "these aren't things that happened at the same time as the [head] injuries." According to Lonergan, both the rib and head injuries required a large amount of force. Lonergan testified that the head injuries were caused by what she characterized as "blunt force trauma," which she defined as the "head hitting something hard." Lonergan also testified that she had never seen a fall from rolling off a sofa onto the floor—even a wood floor—cause the type of injuries that she had observed in B.S. Lonergan added that the multiple fractures on both side of the head "can't be explained from a single fall." Lonergan concluded that what had happened to B.S.'s head was "one of the very worst" cases of head trauma she had ever seen.

- Dr. Timothy George, the head of Pediatric Neurosurgery at Dell, testified that when B.S. was admitted into the hospital, a CT scan of B.S.'s head revealed "evidence of significant bleeding" in the space between B.S.'s brain and his skull, which indicated to George that B.S. "needed to go to surgery right away." The scan also revealed "several skull fractures" and a "subdural hematoma," or blood clot, on the left side of B.S.'s head. During surgery, George confirmed the nature of the injuries, which he testified were consistent with "blunt force trauma," and proceeded to treat them. George testified that there were "multiple injuries on both sides affecting the brain and swelling," which George described as "injuries of high force" and "very substantial." George concluded that such injuries could be consistent with a "high fall, possibly," but a low fall was "much less likely."

- Dr. George Edwards, the Program Director for the Pediatrics Residency Training Program at Dell, consulted on the case. Edwards testified that the "multiple fractures involving so many bones on both sides of [B.S.'s] head" was "pretty strong evidence that he had more than one impact." Edwards also testified that "it's unusual to get any fracture with a household fall," and he did not believe such a fall was the cause of B.S.'s injuries. Instead, he believed that there were multiple "impacts to his head" that had caused severe brain damage to the infant.

The above evidence was in addition to the testimony of Dr. Dolinak, the medical examiner, whose extensive and detailed account of the nature of B.S.'s injuries and the cause of death we have already

25

summarized. On this record, we are convinced, beyond a reasonable doubt, that any error in admitting the statements of Dr. Meyers to Detective Carrasco "would probably not have had a significant impact on the mind of an average juror."[63] Accordingly, any error was harmless.[64]

We overrule Lyons's fourth point of error.

**Exclusion of defensive evidence**

In her fifth point of error, Lyons asserts that the district court abused its discretion by excluding evidence that she claims was critical to her defensive theory of the case. The excluded evidence was testimony by Lyons's fifteen-year-old sister, M.C., pertaining to statements that Lyons's four-year-old daughter, M.L., had allegedly made to M.C. on the night following the incident.[65] The district court excluded this evidence on the ground that it was inadmissible hearsay.

Lyons first argues that the district court abused its discretion by excluding the statements as hearsay because they were actually "statements against interest," a recognized exception to the hearsay rule.[66] "The exception for statements against pecuniary, penal, or social interest stems from the commonsense notion that people ordinarily do not say things that are damaging to themselves unless they believe they are true."[67] "Thus, a reasonable person would not

---

[63] *See id.* at 852-53

[64] *See* Tex. R. App. P. 44.2(a).

[65] The statements were that "[Another child] was over [B.S.]"; "Baby is crying"; "Saw [B.S.] on the floor"; "Hit his head"; "It's my fault Baby [B.S.] hurt"; and "I hit his head."

[66] *See* Tex. R. Evid. 803(24).

[67] *Walter v. State*, 267 S.W.3d 883, 890 (Tex. Crim. App. 2008).

26

normally claim that he committed a crime, unless it were true."[68]  "The rule sets out a two-step foundation requirement for admissibility."[69]  "First, the trial court must determine whether the statement, considering all the circumstances, subjects the declarant to criminal liability and whether the declarant realized this when he made that statement."[70]  "Second, the court must determine whether there are sufficient corroborating circumstances that clearly indicate the trustworthiness of the statement."[71]  When analyzing the sufficiency of corroborating circumstances, factors that may be considered include, but are not limited to:  (1) whether the declarant's guilt is inconsistent with the defendant's guilt; (2) whether the declarant was so situated that he or she might have committed the crime; (3) the timing of the declaration; (4) the spontaneity of the declaration; (5) the relationship between the declarant and the party to whom the statement was made; and (6) the existence of independent corroborating facts.[72]

On this record, the district court would not have abused its discretion in finding that the statements did not qualify for the hearsay exception because there were not sufficient corroborating circumstances that clearly indicated their trustworthiness.  The statements were allegedly made by a four-year-old child to a fifteen-year-old child.  The fifteen-year-old-child was the defendant's sister, who, the district court could have reasonably found, had an incentive to lie

---

[68] *Id.*

[69] *Id.*

[70] *Id.* at 890-91.

[71] *Id.* at 891.

[72] *Dewberry*, 4 S.W.3d at 751; *Davis v. State*, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994).

27

about what she had heard. Moreover, several witnesses had earlier testified that a four-year-old child, even if present in the home at the time of the incident, would not be capable of causing such serious injuries to an infant. Thus, the district court would not have abused its discretion in finding that M.L. was not "so situated that she might have committed the crime." Additionally, the statements were allegedly made several hours after the crime had been committed, which, the district court could have reasonably inferred, indicated that the child could have been coached into making the statements. Also, it would not be outside the zone of reasonable disagreement for the district court to find that the statements were not necessarily inconsistent with the defendant's guilt—it was possible that the child blamed herself for what had happened to B.S. even if she herself did not injure the infant. In only one statement—"I hit his head"—did the child directly admit to injuring B.S., and the district court would not have abused its discretion in finding that this statement was not sufficiently specific as to the nature of B.S.'s injuries so as to corroborate the four-year-old's involvement in the crime. We also observe that in one of the statements, the child attempted to shift blame to another child who, she claimed, was standing over B.S. The Court of Criminal Appeals has held that "[s]elf-exculpatory statements that shift blame to another must be excluded."[73] In summary, it would not be outside the zone of reasonable disagreement for the district court to find that the alleged statements were not sufficiently corroborated, not necessarily self-inculpatory, vague, and made by a four-year-old child to a fifteen-year-old child, both of whom, the district court could have reasonably inferred based on their age and their relationship to the defendant, were unreliable sources. We cannot conclude on this record that the district court abused its discretion by finding

---

[73] *Walter*, 267 S.W.3d at 886.

28

that the testimony did not qualify as statements against interest and, therefore, in excluding the

testimony as inadmissible hearsay.[74]

Lyons next argues that, even if the statements were inadmissible hearsay, their

exclusion violated her constitutional right to present a complete defense.[75] It is true that "the

exclusion of a defendant's evidence can sometimes amount to a violation of [her] right to compel

the attendance of witnesses in [her] favor."[76] "However, 'evidentiary rulings rarely rise to the level

of denying the fundamental constitutional rights to present a meaningful defense.'"[77] "There are two

circumstances in which the *improper* exclusion of evidence may establish a constitutional violation:

(1) when a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering

relevant evidence that is vital to his defense; or (2) when a trial court erroneously excludes relevant

evidence that is a vital portion of the case and the exclusion effectively precludes the defendant

from presenting a defense."[78] Both of these scenarios presume an "improper" or erroneous exclusion

---

[74] *See* Tex. R. Evid. 803(24); *Davis*, 872 S.W.2d at 749.

[75] *See Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006) (holding that state evidentiary rules should, in some cases, be set aside when they prevent defendant from "a meaningful opportunity to present a complete defense").

[76] *Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005) (citing *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002)).

[77] *Id*.

[78] *Id*. (emphasis added).

of evidence.[79]   As we have already established, the district court did not abuse its discretion in excluding the alleged statements of the four-year-old child as hearsay.[80]

However, even if the statements were improperly excluded, we could not conclude on this record that their exclusion prevented Lyons from presenting her defense.  Several witnesses for the defense testified to Lyons's theory that her four-year-old daughter committed the crime.  These witnesses included:  (1) Lyons's husband, Robert, who testified that M.L. had told him that she had pushed the infant down a playground slide in their backyard on the day of the incident and that he had later observed M.L. "swinging a baby doll . . . by the feet and hitting the end table" with the doll's head; (2) one of Lyons's day-care clients, Lindsey Sutton, who testified that she had observed M.L. on one occasion "trying to take [B.S.] from [Lyons's]" arms and "trying to fight for the baby"; (3) Lyons's fifteen-year-old sister, M.C., who testified that on the evening of the incident, she had seen M.L. "grab[] a doll out of a toy box," push the doll down a slide, kick the doll off the slide once it reached the bottom, and then pick up the doll, walk to the kitchen, "and slam[] the doll's head on the kitchen table"; (4) Lyons's friend, Lori Wimberly, who testified that M.L. was "a very strong four-year-old" and "looked big" for her age; and (5) Lyons's mother, Cynthia Cook, who testified that she had also observed M.L. "slam" the baby doll on the kitchen table on the night of the incident.  Additionally, Lyons testified in her defense and spent a significant portion of her testimony explaining why she believed her daughter was responsible for B.S.'s injuries.  We cannot

---

[79] *See id.*

[80] *See Williamson v. United States*, 512 U.S. 594, 598 (1994) (explaining why hearsay is properly excluded as unreliable); *Walter*, 267 S.W.3d at 889-90 (explaining rationale for admitting statements under recognized exceptions to hearsay rule).

30

conclude on this record that Lyons was harmed by the exclusion of M.L.'s statements to M.C., assuming such exclusion was erroneous.[81]

Under this point of error, Lyons also repeats her earlier arguments regarding the district court's denial of her motion for continuance, which she claims resulted in the improper "exclusion" of Dr. Willey's testimony. We have already explained why the district court did not abuse its discretion by denying Lyons's motion for continuance, and that analysis is dispositive of Lyons's complaint here.

We overrule Lyons's fifth point of error.

## CONCLUSION

We affirm the judgment of conviction.

_____

Bob Pemberton, Justice

Before Chief Justice Rose, Justices Puryear and Pemberton

Affirmed

Filed:   February 26, 2015

Do Not Publish

---

[81] *See Potier*, 68 S.W.3d at 665-66.

FILE COPY



# COURT OF APPEALS

THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

JEFF L. ROSE, CHIEF JUSTICE
DAVID PURYEAR, JUSTICE
BOB PEMBERTON, JUSTICE
MELISSA GOODWIN, JUSTICE
SCOTT K. FIELD, JUSTICE
CINDY OLSON BOURLAND, JUSTICE

JEFFREY D. KYLE, CLERK

June 9, 2015

Ms. Angie D. Roberts-Huckaby
Assistant Criminal District Attorney
Hays County Government Center
712 South Stagecoach Trail, Ste. 2057
San Marcos, TX 78666
* DELIVERED VIA E-MAIL *

Mr. Michael C. Gross
106 South St. Mary's Street, Suite 260
San Antonio, TX 78205
* DELIVERED VIA E-MAIL *

RE:    Court of Appeals Number:    03-12-00474-CR
       Trial Court Case Number:    CR-11-0101

Style:    Christina Lyons
          v. The State of Texas

Dear Counsel:

Appellant's motion for rehearing was overruled by this Court on the date noted above.

Very truly yours,

JEFFREY D. KYLE, CLERK

BY:  _E. Talerico_
        Liz Talerico, Deputy Clerk